The next case is No. 2007-5083, the Nevaska Public Power District v. United States. Mr. Silberg. Good morning. I may please support your honor. Representing plaintiffs caught in this case, I'm Jay Silberg from Pillsbury, my third shop that's been with me. Here is my colleague, Alex Tereshek. In 1997, the D.C. Circuit issued a limited mandamus order to prohibit DOE from violating its unconditional statutory obligation under the Nuclear Waste Policy Act. Nine years later, the trial court in this case declared that the D.C. Circuit's mandamus order was void, claiming that the D.C. Circuit had acted without a waiver of sovereign immunity. The trial court candidly acknowledged that its decision was admittedly novel. We respectfully submit that the decision is both admittedly novel and wrong. Where is it wrong, specifically? It's wrong in several ways. It's wrong on all aspects of the sovereign immunity, and I'll cover that. But before we get there, it's wrong because it did not take advantage of the opportunity to avoid the vexing choices that it made with respect to judicial comedy, judicial restraint. It could have decided, and it should have, but didn't. If the D.C. Circuit acts outside of its jurisdiction, does it need to have respect for that decision? Or can it say that it acted outside of its jurisdiction, and therefore it's void ab initio? If it violated sovereign immunity under the court's decisions, then that was properly determined to be void. Well, it was premised on the basis that it was outside of its jurisdiction. I think the lower court said specifically that the decision by the D.C. Circuit in Indiana, Michigan, was outside of its jurisdiction, and so was Northern Power, which resulted in the mandamus order, the second. Yes, the decision in Indiana, Michigan, was clearly not outside of the D.C. Circuit's jurisdiction. That was a decision, that was a case, which we brought in 1995 to challenge a statutory interpretation that the DOE made, a final agency action that the D.C. – that the DOE had made with respect to its interpretation of the Nuclear Waste Policy Act. That decision was clearly within the D.C. Circuit's jurisdiction under Section 119 of the Nuclear Waste Policy Act. It was a final agency action. It was determining what a statute meant. There was, at that time, no possible way to bring a claim before the court of federal claims. There was no breach of any contract. There were no claims for damages. The utilities were not seeking any damages. And you couldn't bring an anticipatory breach action at that point? No. This court has held in Indiana, Michigan that anticipatory breach is not appropriate because the utilities must have this contract. Now, hypothetically, if they had jurisdiction in Indiana, Michigan, could they have also had jurisdiction in the northern power? Is that an extension of the same jurisdiction in all of it? It is, Your Honor. In northern states' power, the D.C. Circuit was affirming the decision that it had reached. It had directed DOE to carry out an unconditional obligation. After the Indiana, Michigan decision, DOE determined that its obligation was, in fact, not unconditional because it said it wasn't going to carry out the obligation. In fact, because it thought it had an unavoidable delay, there was no obligation. The D.C. Circuit felt it was obligated when we filed for mandamus to direct DOE to conform to the earlier Indiana, Michigan decision. But that was not conformance with the earlier decision. It was conformance with a determination as to whether or not DOE could use a defense of inability to perform under the contract, under the northern power decision. In Indiana, Michigan, the court ruled that DOE had an unconditional obligation. DOE then, in essence, said, no, we don't. And when we went back to enforce the earlier decision in Indiana, Michigan, the court did not give us the full mandate because they said we had a potentially adequate other remedy under the standard contract. DOE, however, stated that they believed they had, in essence, no obligation because if they were not going to perform, if the delay was unavoidable, then all it had to do was reset the clock, never pay damages, and utilities were without any remedy whatsoever. Oh, you still have a remedy in the court of claims, wouldn't you, under the Tucker Act? If, in fact, you sued for anticipatory breach or a breach of the contract at that point, wouldn't you have a remedy in the court of claims? We cannot sue for anticipatory breach for the reasons we just talked about. You can only have anticipatory breach, as this court held in Indiana, Michigan, if the contract goes away. We can't have that contract go away. Otherwise, we lose our NRC licenses. We cannot sue for a breach of contract because there was no breach of contract. 1998 had not yet occurred. So we were stuck. If we didn't challenge the DOE ruling, the DOE final agency interpretation, issued in 1995, DOE would come back and say five years later, we made this interpretation, you didn't challenge it, it was final agency action, you have a 180-day clock under Section 119 of the Nuclear Waste Policy Act, you're out of luck. What the government was trying to do was place us in an untenable position. Heads, they win. Tails, we lose. We had to go into the D.C. Circuit. We had to get that interpretation set aside. And when they continued not to carry out the direction of the D.C. Circuit, the D.C. Circuit was perfectly within its rights, and we signed cases and armies, to issue an order to direct DOE to carry out that earlier decision. The D.C. Circuit was not making contractual, was not determining contractual damages. It was not interpreting the terms of the contract, and it says so specifically in its May 5, 1998, order. Well, in the order itself, to quote Judge Santel, although it was precarious, the issue was whether northern states ascribed to the nature of DOE's obligation, which was created under the Act and undertaken. It does not place the question of contract remedies in this court. Now, the contract remedies goes to the issue of damages, the adequacy of damages, does it not? Or any damages. What the D.C. Circuit said in the May 5, 1998, order was that there was a DOE obligation that was created by the Nuclear Waste Policy Act. And interpreting the contract, as DOE did, as a contingent disposal obligation, would place DOE in violation of the statutory duty, which the D.C. Circuit had expressly established in the Indiana, Michigan case. Well, aside from the fact that they were interpreting Section 302, which I guess under even our law in the Federal Circuit, in the PSGE case, or PGSE case, whatever it is, it turns out that they can interpret 302. However, can they limit the government's ability to limit the remedies and damages? Because that's not really a statutory interpretation. It's a contractual interpretation, which is beyond possibly the authority and the jurisdiction of the D.C. Circuit. I don't believe it is. The government had basically taken the DOE direction that there was an unconditional statutory obligation and was saying, no, there isn't. Now, whether they did that in a contract, in a contract interpretation, in an order, in a regulation, it's still looking at what the statute said. And until DOE got it right in terms of meeting its obligations under the statute, the D.C. Circuit was perfectly within its jurisdiction to deal with that. The D.C. Circuit said, we don't want to get into the contractual remedies. We don't want to interpret contract terms. What we want to do is have the government abide by its clear statutory obligation, which the D.C. Circuit has repeated, which this court has recognized, and to allow the government to walk away from that obligation, to say that there are unavoidable delays, which means there are no damages, which means there is no unconditional obligation, and DOE can just push the clock out as long as it wants. Well, that's an assumption we're making, though, that there are no damages at that point. There could be damages. Not if they're under the government's interpretation. If there are unavoidable delays, there are no damages. Well, the government's interpretation of the contract clause might be interpreted differently by the Court of Federal Claims. The clause specifically states— I understand what the clause says, because I presume that that's the same clause that was put in the regulations and adopted under the standard contract. Yes, all the contracts have the same clause. But what that clause says is that in the event of an unavoidable delay, the parties will readjust their schedules to accommodate that delay, and there are no damages. It's only change of schedules. But once again, it's not a change of schedules, what the D.C. Circuit was concerned about. The D.C. Circuit was saying you can't use that defense as a remedy against breach of contract. So they're interpreting basically the language of the contract and the ability of the federal government to use that as a remedy, which does infringe upon the sovereign immunity aspects of the defense of the contract. Well, for the reasons that we set forth in our brief, the sovereign immunity arguments that the trial court has gone through are not sound. And there are many reasons, and I think we laid them all out in our brief. The one point I would like to note before I get into my reserved time is that I don't think it was necessary for the judge to make that decision, because in the main Yankee and the northern states power cases, this court has already found that both the delays clause, both parts of the delays clause, the unavoidable and the avoidable, are dealing with the issue of a delay. And a delay as interpreted in those two cases means something other than the gross programmatic 20-year-plus delay that we have. It means a delay in delivery, acceptance, and transport. Let me interrupt where you were. In fact, the trial court did have to make that decision, did they not? Because if they gave some kind of collateral estoppel effect to the ruling of the D.C. Circuit, the government's case is quite different. That's correct. And very much weaker. Yeah, that is correct. So when you said the trial court didn't have to make that decision, didn't have to reach that issue, did I hear you correctly? No, what I was saying is I don't think this court needs to reach the issue of sovereign immunity, because the definition of delay in the delays clause, both for avoidable and unavoidable delay, has already been decided. And the kind of delays that the government is seeking to raise, the unavoidable delay, where allegedly everything that happened that makes this program not start in 1998, but maybe in 2020, if we're fortunate. Well, on the contract interpretation side, I agree. Sovereign immunity is no longer an issue. But I think if you look at the question of what a delay means, if delay means, as we think it means, a delay in delivery, acceptance, and transport, then we're not dealing in these cases with that kind of a delay. So this delays clause, whether it's avoidable or unavoidable, simply doesn't apply. And if this court makes that decision, I think you can avoid reaching all these, as the trial court said, vexing questions surrounding what sovereign immunity involves. And I'd like to reserve the rest of my time. Thank you, Mr. Silbert. Mr. Lester. May it please the Court. It's quite dramatic, isn't it, to tell a trial court, never mind, ignore what this circuit court has said on an issue, which relates to what's before the trial court, even if not within the same circuit. Well, Your Honor, the written mandate is here, orders DOE to, and I quote, proceed with contractual remedies, unquote, in the manner directed by that court. It expressly precludes DOE from, quote, from concluding that its delay is unavoidable on the ground that it has yet to repair a current repository, unquote. And it directs the DOE, quote, not implement any interpretation of the standard contract that excuses its failure to perform on the grounds of the provisions that are contained within the unavoidable delays clause. As this court recognized in Christopher Village, and I quote, a party may not circumvent the claims court's exclusive jurisdiction by framing a complaint in the district court, or here the sister appellate court, as one seeking injunctive, declaratory, or mandatory relief. But it wasn't circumvention. They were properly before the D.C. courts on the issues as they were raised, mandamus, injunction. Well, we disagree, Your Honor. The gist of Nebraska's argument here is that the Nuclear Waste Posse Act contains a specific statutory provision requiring not only that DOE include a provision in the contract that it formed back in 1983, but also that DOE meet that January 31, 1998 acceptance deadline, and that DOE pay money damages if it does not begin acceptance by that date. But that would be in the statute whether or not the statute required a standard contract. Well, actually, Your Honor, the statute doesn't require all of the things that Nebraska alleges. The only thing that the statute required with regard to the January 31, 1998 date is that contracts that, and I quote again from the statute, contracts entered into under this section of the statute shall provide that, and it listed a couple of things that the contract that DOE was to provide, and that included a January 31, 1998 date for beginning acceptance. The statute itself does not contain any other language that defines exactly what the contract terms had to contain, what the contract had to contain, and it didn't define what kind of remedies DOE could, with the parties' agreement, place into the contract and what the remedies would be if there were delays. Specifically here, specifically with regard to the January 1998 date, it does not appear anywhere else in the entire statute. The only place it appears is in the one paragraph where the statute defines what contracts that DOE would enter with the nuclear utilities would contain, what terms they would contain. That's a very interesting matter of draftsmanship, I agree, because in trying to decipher whether the intention is, therefore, that there's no remedy other than under the standard contract, and in the Court of Federal Claims, because of the way the statute had been written, because had the statute say that in implementing this legislation, these are the conditions that we foresee, it would properly be in the regional circuits, would it not? Until a contract is written because we do business through agreement and contract, rather than fiat, which would then, if there's a breach of contract and if the remedy is monetary, would take it to the Court of Federal Claims, but otherwise, the D.C. Circuit, did you move in the D.C. Circuit to remove the issue or appeal the portion of its decision, which as interpreted and pretty much as it says, says you can't circumvent our judgment of mandamus and injunction by pleading breach of contract? If I understand correctly, Your Honor, if you're talking about the specific written mandamus that was issued barring reliance on the multiple delays clause, there was actually sort of a bizarre way that this ended up in the D.C. Circuit. There was actually a final interpretation of the 1998 date obligation that was published in the Federal Register that defined DOE's interpretation of whether or not if no Federal repository, which Subtitle A of Title 1 directs DOE to develop, if there was no repository available by January 98, whether or not DOE would be obligated to begin accepting by that date, specifically tying the repository to the 98 date. Because that underlies all of the issues that are being raised. Well, not exactly, Your Honor. Actually, that petition was filed then by several of the nuclear utilities challenging that final interpretation. During the briefing on that, during that petition for review, towards the end of the briefing, in fact, there was a letter that was sent out by the contracting officer to the nuclear utility contract holders, in which she identified her preliminary determination that even if DOE had to begin accepting fuel by 98, even without a repository, her preliminary view was that the unavoidable delays clause would kick in, and she listed reasons in that letter why she thought that, and that DOE would try to work with utilities to implement that and to minimize any impact upon them from the unavoidable delay. The utilities provided a copy of that letter to the D.C. Circuit, and that, although there was never a full briefing on that issue, that letter became the basis of the writ of mandamus that precluded. So then following the writ of mandamus issuance, the Solicitor General did petition the Supreme Court for cert on the jurisdictional issue with regard to whether the writ was, in fact, within the D.C. Circuit's jurisdiction, whether there was an appropriate writ of mandamus. The writ of mandamus, but was the issue raised as to whether, in fact, the D.C. Circuit had exceeded its authority in this statement, which would apply, which was directed to contract interpretation? Well, if you're talking about not being able to rely upon the unavoidable delays clause, yes, Your Honor, that was specific. That was specifically addressed by DOE both in the minimal briefing there was on that preliminary determination, and then in the Supreme Court cert petition by the Solicitor General. Okay, but it was allowed to stand. And now for us to say, never mind, we hold that the Circuit exceeded its authority is troublesome, as you can imagine. Well, it is an unusual situation, Your Honor, but it is no different than the situation this Court faced in the Christopher Village case. There, the Fifth Circuit made a determination that issued a declaratory ruling on the contract terms, and this Court found, as affirmed in the trial court's finding below, that the Fifth Circuit had, in fact, acted beyond its jurisdiction without an appropriate waiver of sovereign immunity, and found that that judgment by the Fifth Circuit was void, and, in fact, this Court came to a very different conclusion from the Fifth Circuit on the merits of the— I don't know if there was a cert petition, but if, in fact, the Supreme Court declined to correct this error in this case, it stands. Well, Your Honor, I don't think that we can, and I think the Supreme Court directs that we should provide any real merits deference to a cert denial. We rely upon Supreme Court decisions, not upon the denials where there, particularly at that point in time, there wasn't a split in the Circuits with regard to this particular issue. There may have been many reasons that the Supreme Court did not accept cert on that petition, but that doesn't mean that the Supreme Court somehow informally agreed with the D.C. Circuit there, or that this Court somehow needs to provide some kind of greater deference to the D.C. Circuit's determinations that it would in, say, a case like Christopher Village that did not— All right, but then even under ordinary comity, it receives a significant weight in deference, does it not? Well, I don't—again, Your Honor, I am not aware of any precedent that would require some kind of deference to a Supreme Court denial of a cert petition. I think that we act as though, just as we would in any case, this Court should act as it would in any case to determine, as the trial court here did, reviewing the statute, the type of claim that's being made, the fact that it is, in fact, a contract claim that the Court of Federal Claims traditionally would have jurisdiction over, and looking at all those things, the trial court here properly determined that, in fact, the D.C. Circuit had exceeded its jurisdiction. But they didn't decide the contract case. All they said is that—set aside this specious argument that it was unavoidable. But yet, Your Honor, that it was interpreting the contract, and that is something that is, first of all, beyond the statute. The statute does not mandate what the contract terms with regard to remedies could provide. It didn't define what the parties could have agreed to. No, we didn't reach remedies. I realize this is a highly certified question. And, in fact, Your Honor, from this Court's own decision in P.S.C.G. Nuclear, which, about a year ago, this Court also considered the judicial review provision of the Nuclear Waste Policy Act, it specifically found that the performance of and any damages for failure to meet the obligations in the contracts were not provided for by statute, although the Court expressly declined to determine the specific issue here, and that is whether or not the Nuclear Waste Policy Act judicial review provision extended to the Section 302A.5, which is the statutory provision at issue here. The rationale of the decision, specifically talking about how the performance, and specifically any damages for failure to meet DOE's obligations, that the judicial review provision did not extend to that, I think the logic of that P.S.C.G. decision informs what should be the Court's decision here. In terms of, here, the D.C. Circuit clearly was looking at the contract, it was looking at the remedies provisions, and determining whether or not it liked a remedy provision or not. That is certainly something that the Court of Federal Claims can and has in the past performed on its own. Not in this particular case, but certainly the Court interprets, the Court of Federal Claims interprets contract provisions. It looks at the plain language. It will interpret the provision in light of any appropriate regulations or statutes that underlie that, and there's simply nothing that the Court of Federal Claims couldn't do in terms of its review of the contract clause here that the D.C. Circuit didn't purport to do here. As a result, there's no reason that the Court of Federal Claims should not be the appropriate forum for deciding, for reviewing the Unemployment Release Clause and determining whether it applies, and so the extent to which it applies in these cases. Was the limitation on the remedies really outside of their jurisdiction, or was it outside of their statutory jurisdiction to interpret the statute and not the contract? Do they have the ability in the jurisdiction to interpret the contract, or only the statutory terms of the contract? The D.C. Circuit certainly did not have authority or jurisdiction in the labor of self-immunity to interpret the contract terms itself. Well, again, I guess it does go back to our jurisdictional argument. The judicial review provision in the Nucleus Posse Act is a little complicated. I have to admit it's a little messy, the way that the statute is developed. It's a quagmire if you want to try to go through it. I'm sorry? It's a quagmire. But in PSEG Nuclear, I think the Court here did discuss how the judicial review provision only refers expressly to Subtitle A of Title I. What we have here is in Title III. But there is at least some extended scope of the NWPA judicial review provision outside of Subtitle A, Title I. So the express language of the judicial review provision as written has been expanded both by the D.C. Circuit and by this Court. The issue is how far does that scope go? And there are, I think, three different ways that the Court could look at the judicial review provision as it applies here, all three of which would preclude the D.C. Circuit from doing what it did. One is, in PSEG Nuclear, this Court limited the scope of the judicial review provision to provisions outside of Subtitle A, Title I that apply to the creation of repositories. Here, as we talk about in the brief, the D.C. Circuit, at least in Indiana, Michigan, held that the provisions dealing with repositories and with the 98-date are actually separate. The government is not taking the position that the D.C. Circuit did not have jurisdiction in Indiana, Michigan, is it? Well, Your Honor, I think the logical application of this Court's decision in PSEG Nuclear is that, in fact, Indiana, Michigan was beyond the D.C. Circuit's jurisdiction. But there wasn't a request for damages. It was whether or not to order compliance with the statute. And really, if you must go that far, it puts it on quite tenuous grounds. Well, it really depends then on what you view the statute as requiring. Here, what the statute requires with regard to the 98-date is only that contracts entered into under the NWPA include that date in the contract. The contracts were developed in 1983, and the date was included in the contract in 1983. There is a statute of limitations provision in the Nuclear Waste Policy Act that limits challenges to 180 days after the action is made. Here, given that these were being placed in the contracts, the logical extension of that is that any challenge to that, and there are three different rationales for doing this. This is the third that we talk about in our brief, that any jurisdiction by the D.C. Circuit at that point in time ended after 180 days after these contracts were developed in the Federal Register. No one challenged the terms back then. And so at that point, after that, things become the remedies provisions, what damages might be available for failing to meet the date that is in the contract. Those become contract administration matters that the Court of Federal Claims traditionally, and as should in this case, have jurisdiction to entertain. Here, the D.C. Circuit overstepped its authority and its jurisdiction, acted without a waiver of sovereign immunity by going that far, by stepping into the remedies provisions of what were in the contract and outside of its jurisdiction. I see that time is up. I just have one question, Mr. Lester. Does the delay provision get triggered only upon a breach, or is it triggered before? Well, Your Honor, let me address Mr. Silber's remarks to that. Obviously, in our brief, we discussed how there wasn't any litigation about the unavoidable delays clause in the Northern states or in many Yankee cases below. There was no discussion of the merits of that clause that's in the briefing to this Court. So there was a typo in the Northern states' decision. However, with regard to the merits, again, the merits are not before the Court right now. The trial court did not review the merits of it. But just in the line of the Court's interest, I will point out that the clauses began very differently. The unavoidable delays clause starts out saying, neither the government nor the purchaser shall be liable under this contract for damages caused by failure to perform its obligations if specific types of delays, some of which are identified in the clause, come about. The avoidable delays clause says, in the event of any delay in the delivery of a substance of fuel, there's an administrative process to go through. The clauses are written differently. And in fact, in Maine Yankee, this Court found that DOE's delay was in fact a failure to perform, which is this specific line, which is identified in the first sentence of the unavoidable delays clause. Okay. Thank you, Mr. Lester. We'd ask the Court to confirm the decision below. Thank you, Your Honor. Reggie, would you enlarge Mr. Silberg's time by the amount we ran over? Thank you, Your Honor. First, we would agree that the Court of Federal Claims is the appropriate forum to resolve contractual disputes. But this case, what we're talking about here, is not a contractual dispute. The D.C. Circuit was very careful in trying to allocate the responsibilities that it had in statutory interpretation as opposed to the Court of Federal Claims on contract interpretation. And they told us to go there to deal with our contract remedies, and we've done that. Christopher Village is not NPPD. In Christopher Village, that case was a predicate for damages. When we went to the D.C. Circuit in 1994, 1995, 1996, and 1997, we were not seeking a predicate of damages. We were seeking an interpretation of DOE's statutory obligation. But a statutory obligation relating to the contract. It's a statutory obligation. As this Court said in the NSP case, the obligation was created by the Nuclear Waste Policy Act. It's an obligation in the contract. It's memorialized. It's an obligation in the statute. It's memorialized in the contract. But it's clear, the decisions make it clear, that it is not just a contractual obligation. And this Court said just that in the Northern States Power case. Christopher Village was also forum shot. It was obvious that they were going from court to court looking for the result, as was the case in Consolidated Edison. Was there a statutory interpretation contract in Christopher Village? Christopher Village involved contract. It involved regulation. It did not involve statute. The decision was very clear in saying that that was not a statutory case. You're probably more like Burbank then, aren't you? Burbank was kind of mixed, because some of the provisions in that contract was mandated by statute, and others weren't. Isn't that the case here? No, because what we're talking about here is the unconditional obligation. The unconditional statutory obligation. It is not a question of interpreting a provision on how you're going to deal with the contract. The D.C. Circuit was very clear that those are things you go to the Court of Federal Claims. If we wanted damages, we go to the Court of Federal Claims. We did that. We were directed to do so by the D.C. Circuit. And we and many other utilities are in the Court of Federal Claims seeking damages right now. Race judicata. We believe that the Indiana, Michigan, and NSP cases are race judicata, unless there's a sovereign immunity. It's not just jurisdiction. It has to be a sovereign immunity factor that you would apply through Christopher Village analysis to get overturned, the race judicata collateral stop effects of Indiana, Michigan. And PSEG made very clear that a contract claim goes to the Court of Federal Claims. PSEG also made very clear that the scope of Section 119 is much broader than the government would now say. They're a little late, it seems to me, to argue that the D.C. Circuit in 1996 didn't have the right jurisdiction. If they wanted to do that, they should have raised it then. They tried to, perhaps, in the Supreme Court. They didn't get anywhere. That issue is over. It's over, and we should let it rest in peace. Mr. Silbert, I still have a problem because if the case goes to the Court of Federal Claims and you have a contract issue before the Court of Federal Claims, is it proper for another court to limit the government's ability to litigate under that contractual language? If the government was told 10 years ago that the statute does not allow them to make certain arguments, that Congress had said that's really outside their scope, then it is appropriate. But if it relates to damages, isn't it really an issue of sovereign immunity at that point? I don't believe so because the sovereign immunity waiver was to interpret D.U.E.'s statutory obligation. If you're saying that D.U.E. can now, having been told in no uncertain terms by the D.C. Circuit that the statute means X, that they can now run to a different court and say, well, maybe the statute means Y. They didn't interpret the statute. They interpreted a contract. The D.C. Circuit said that they were interpreting the statute. The D.C. Circuit said you are not to interpret your statutory obligation in a way that violates the statute. That's what they're trying to do by undoing the mandate. And we keep getting back, this is not a contract claim. We are seeking to enforce D.U.E.'s statutory obligation. They've been told over and over again that that's what the statute means. They're trying to end run around that. It certainly has all the clothes of a contract, doesn't it? Excuse me? It has all the clothes of a contract. It's clothing and contract. Well, the fact that a statutory obligation was also put in the contract doesn't mean that it's no longer a statutory obligation. Once a statutory obligation, always a statutory obligation, whether it shows up in a regulation, which it does, whether it shows up in a contract, which it does, that doesn't mean that it's no longer a statutory obligation. They have to live with what they were told the statute means. They didn't like the result. They appealed it. They lost. They asked for reconsideration. They lost. They're trying another end run. And we would ask that this court not allow them to do that. Mr. Silver, do you think that they could use an act of God or flood or something like that to ameliorate their damages under the contract? If performance had begun and an unavoidable delay such an act of God occurred, then that would certainly impact the damages that we could recover. But that clause only applies in the event that performance of the contract had begun. The delay in the unavoidable delays clause means the same as the delay in the avoidable delays clause. A delay is a delay. Once the program starts, you're certainly correct, that would be a contract issue. It would be in the Court of Federal Claims. But before there's a program where you have a total failure of the program to start, we're not in the space of that delays clause. This court held that in the main Yankee and those days power case, and I think that's by now clear. But the delay provision is only triggered by a breach. We believe that until – that the delay provisions do not occur, are not relevant in the scope of this programmatic breach. It's only once the program starts and the trucks start to roll. Then if you had a snowstorm, then it would be an act of God. Then if you had a fire, then it would be an unavoidable delay. Then if you had a strike, it would be an unavoidable delay. Then if you had DOE doing something improper, then it would be an avoidable delay. But until the program gets going, we're just not dealing with these clauses. And I think that's what the D.C. Circuit told DOE, and that's what DOE has never accepted. And they've tried over and over again. And this is just one more opportunity to re-raise these same issues. And we hope finally this court will put those together. Thank you, Mr. Silberg. Mr. Lester, the case is taken under submission.